IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 25, 2017 at Knoxville

**STATE OF TENNESSEE v. ERIC SIMS**

**Appeal from the Criminal Court for Shelby County**
**No. 14-00672       James M. Lammey, Judge**

_____

**No. W2016-02049-CCA-R3-CD**

_____

Following a jury trial, Eric Sims, the defendant, was convicted of one count of first degree murder, six counts of attempted first degree murder, and six counts of employment of a firearm during attempted first degree murder. The trial court imposed an effective sentence of life in prison plus one hundred and eighty-six years. On appeal, the defendant challenges the sufficiency of the evidence to sustain his convictions, the admission of evidence regarding his gang affiliation, and the length of his sentence. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Robert Golder, Memphis, Tennessee (on appeal), and Joseph McClusky and Chelsea Harris, Memphis, Tennessee (at trial) for the appellant, Eric Sims.

Herbert H. Slatery III, Attorney General and Reporter; Breanne N. Hataway, Assistant Attorney General; Amy Weirich, District Attorney General; and Raymond Lepone and Neil Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

Around 10:00 p.m. the night of August 2, 2013, Ronald Singleton and Tradarius Jones, known as "T.J.," got into a fight near the intersection of Bishops Bridge Road and Beauchamp Drive in Memphis, Tennessee. Mr. Singleton was a middle ranking member of Piru, a street gang affiliated with the Bloods. Mr. Jones was a member of Crips,

another street gang. Following the fight, Mr. Singleton returned to the nearby home of Jason Smith, where several other Piru members were gathered, including the defendant, Jerome Jackson, Darius Buckner, and Jason Smith. The defendant was the highest ranking Piru member present, followed by Mr. Jackson and Mr. Smith. Mr. Buckner was the lowest ranking gang member present. After learning of the fight, the defendant, Mr. Jackson, Mr. Smith, and Mr. Buckner left to find Mr. Jones. Mr. Smith left in his black Pontiac GTO. Mr. Jackson left in his purple Plymouth Breeze, with the defendant and Mr. Buckner riding as passengers. The defendant, Mr. Jackson, and Mr. Smith all wore their hair in dreadlocks. The defendant brought his .357-caliber handgun with him that, according to Mr. Singleton, he always carried. Mr. Singleton stayed behind at Smith's house.

The defendant and his fellow gang members returned to the intersection of Bishops Bridge Road and Beauchamp Street and found Mr. Jones. As the victims, Montarius Pigrum, Kaylin Brown, Addrinne Odom, Michael Tate, Cedrick Ford, Demetrius Ford,[1] and Tyrone White approached the intersection, they saw a dark car with tinted windows in the middle of the street and several men fighting Mr. Jones. One of the men looked at the victims and said something like "you all want some of this?" and "this Piru stuff." The victims, who were unarmed, saw the defendant and another man had guns, so they began running. Mr. Buckner and one of the men with dreadlocks began chasing the victims down Beauchamp Street. As the victims ran from the men, gun shots were fired at them. Demetrius testified that as he ran, he could hear bullets fly past his head. According to Cedric, one of the bullets hit the ground close to his foot.

At trial, the witnesses offered conflicting testimony regarding who fired the shots and which man with dreadlocks chased the victims down Beauchamp Street. Mr. Odom could not identify the man who fired the shots and testified, "The person that was shootin', he had dreads, and that's all I just know that he had." Mr. Jackson testified that he and Mr. Buckner chased the victims, but the two of them were unarmed, and the defendant fired the shots. Mr. White identified Mr. Buckner, who did not wear his hair in dreadlocks, as the individual who fired the gunshots. Mr. Tate identified the defendant as the man who fired the shots. Cedric identified Mr. Smith as the individual who fired the shots, and Demetrius identified the defendant as the one who fired the shots.

The victims separated as they ran. The defendant returned to the dark car, climbed into the driver's seat, picked up Mr. Jackson, and moved to the front passenger seat of the vehicle. Mr. Pigrum, Mr. White, and Cedric ran down Beauchamp Street, climbed a fence, and ran into Bertram Cove. Mr. White and Cedric hid together in the backyard of

---

[1] Victims Cedrick Ford and Demetrius Ford share a last name, so we refer to them by first name only for the remainder of this opinion and intend no disrespect when doing so.

a house in the cove. Mr. Pigrum ran in a different direction and ended up in the driveway of a neighboring house. While hiding, Cedric saw the same car he noticed by the park pull into the cove. The defendant exited the passenger side of the car and fired shots at Mr. Pigrum. Later that night, Cedric and the other victims learned Mr. Pigrum died.

Christopher Gainer, who lived on Bertram Cove, was in his driveway at the time Mr. Pigrum, Mr. White, and Cedric ran into the cove. Mr. Gainer saw Mr. White and Cedric hide in a yard two houses away, and Mr. Pigrum run into Mr. Gainer's driveway. Mr. Pigrum advised Mr. Gainer there had been a fight in the park and gunshots were fired. Mr. Gainer asked Mr. Pigrum if he needed to call somebody, and Mr. Pigrum said no. Mr. Gainer then saw Jackson's Plymouth Breeze pull into the cove. The back end of the car was wrecked, and because of the damage, Mr. Gainer recognized a photograph of the car at trial. Mr. Gainer said a man was hanging out of the passenger side of the car and fired gun shots in his direction. Mr. Gainer went into his house, leaving Mr. Pigrum in the driveway. Mr. Pigrum ended up getting shot, as did Mr. Gainer's car. At trial, Mr. Gainer testified that he heard from his house the gunshots fired near the park approximately ten minutes before witnessing the gunshots fired in his driveway.

Mr. Jackson testified that he drove his car into Bertram Cove and saw Mr. Pigrum in a driveway. As he turned around in the driveway, he hit the back of his car on the curb, and the bumper fell off his car. He got out of the car to retrieve the bumper, and the defendant began arguing with Mr. Pigrum, eventually shooting him. Mr. Jackson and the defendant then returned to the car and drove back to Mr. Smith's house.

Mr. Singleton was waiting in the driveway of Mr. Smith's house when the defendant, Mr. Jackson, Mr. Buckner, and Mr. Smith returned. According to Mr. Singleton, the gang members were gone approximately ten minutes, and he heard two sets of gunshots fired during that time span. The men discussed what happened, and the defendant said he fired shots.

Officer Branley Pfeil with the Memphis Police Department ("MPD") responded to the emergency call to Bertram Cove. The caller initially reported suspicious activity and an unknown individual banging on the front door, but Officer Pfeil learned en route that gunshots had been fired and someone had been injured. Officer Pfeil arrived and found Mr. Pigrum unresponsive with a gunshot wound to his face. Officer Pfeil spoke with Mr. Gainer and waited on the other officers and the ambulance to arrive. Officer Marcus Mosby, also with the MPD, responded too. As the crime scene investigator assigned to the matter, Officer Mosby was tasked with preserving and collecting evidence at the scene. Both Officer Pfeil and Officer Mosby identified photographs of the crime scene and of Mr. Pigrum.

The following morning, Detective Fausto Frias and Officer Stacy Milligan with the MPD collected four bullet casings from the corner of Bishops Bridge Road and Beauchamp Drive. Special Agent Cervinia Braswell, the Tennessee Bureau of Investigation ("TBI") forensic scientist assigned to identify the firearms, was tendered as an expert in her field at trial and identified three of the casings as .357 Winchester bullet casings and one as a .40-caliber Winchester bullet casing. Detective Frias and Officer Milligan recovered eight bullet casings from Bertram Cove. Agent Braswell identified them as .357 Winchester bullet casings. According to Agent Braswell, all the .357 bullet casings were fired from the same gun, which was most likely a Glock or Smith & Wesson Sigma Series pistol. All recovered bullet casings appeared fresh.

Officer Michael Coburn, an MPD crime scene investigator, processed two vehicles as evidence in this matter. On August 5, 2013, he processed a black Pontiac GTO for DNA and fingerprints and retrieved sixteen print cards from the vehicle. The fingerprints recovered belonged to the defendant, Jackson, and Smith. He also collected items from the vehicle, including a paystub belonging to Smith. On August 13, 2013, Officer Coburn processed a purple Plymouth Breeze for DNA and fingerprints, and retrieved eight print cards from the vehicle. The fingerprints recovered belonged to the defendant and Jackson. He also collected clothes found inside the vehicle and a shoebox found inside the vehicle. The shoebox also had fingerprints belonging to Jackson.

Karen Chancellor, M.D., the chief medical examiner for Shelby County, performed an autopsy on Mr. Pigrum and was tendered as an expert in her field at trial. Dr. Chancellor's external examination revealed two gunshot wounds, one on the left side of Mr. Pigrum's jaw and one on the left side of his neck. During her internal examination, Dr. Chancellor found two bullet fragments in the left side of Mr. Pigrum's neck and determined the bullet tore the left carotid artery and left jugular vein, two of the largest blood vessels in the body. Dr. Chancellor opined the cause of Mr. Pigrum's death was a gunshot wound to the neck, and his manner of death was homicide. According to his mother, Katrina Pigrum, Mr. Pigrum was seventeen years old at the time of his death.

Following the close of the State's proof, the defendant moved for a judgment of acquittal, and the trial court denied the request. The trial court then considered whether it would allow the State to impeach the defendant with his prior felony convictions for aggravated burglary, two counts of aggravated assault, and reckless endangerment with a deadly weapon, all occurring within the past ten years, and ruled the prior convictions were admissible under Rule 609 of the Tennessee Rules of Evidence. The trial court then held the defendant's *Momon* hearing, and the defendant expressed his desire not to testify. The defendant did, however, proceed with calling Khadijah Woods and Cornell Brown to testify on his behalf.

- 4 -

Ms. Woods, the defendant's sister, testified that she lived in an apartment with the defendant and their mother in August of 2013. She remembered August 2, 2013, because it was the Friday before school began. She and the defendant were in the apartment together all day. Cornell Brown stopped by the apartment that night, and the defendant briefly went outside to talk to him. The defendant did not leave the apartment any other time that evening.

Mr. Brown testified that he remembered August 2, 2013, because he was released from jail that day after being falsely accused of murder. He had been incarcerated for fifteen months and was released around 7:00 p.m. After his release, Mr. Brown's girlfriend took him to his grandmother's house. Mr. Brown visited his grandmother for an hour and left to visit his mother. On his way to his mother's house, Mr. Brown decided to stop at the defendant's apartment to see if he still lived there. The defendant was home, and the men talked in front of the apartment. On cross-examination, Mr. Brown agreed he would be surprised to learn jail records show he was released at 9:13 p.m. on August 2, 2013, because he remembered being called for release during dinner.

In rebuttal, the State called Sergeant Kevin Lundy to testify. Sergeant Lundy assisted Detective Frias with his investigation and interviewed the defendant on August 12, 2013. The defendant knowingly gave his statement and knew he was a suspect at the time Sergeant Lundy spoke with him. The defendant indicated he was not at the scene of the homicide the night of August 2, 2013, but he could not remember where he had been instead. The defendant admitted to being the "O.G." over the Bloods in Memphis and said if the homicide had been gang-related, he would have known about it.

After being charged and hearing closing statements, the jury found the defendant guilty of one count of first degree murder, six counts of attempted first degree murder, and six counts of employing a firearm during attempted first degree murder. The trial court approved the jury's verdicts and sentenced the defendant to life in prison on the first degree murder conviction. The trial court then scheduled a sentencing hearing for the remaining convictions.

Prior to the sentencing hearing, the State filed a notice of enhancement factors and a motion for consecutive sentencing. At the sentencing hearing, the trial court heard arguments from both parties, considered Ms. Pigrum's victim impact statement, and considered the presentence report. When doing so, the trial court noted the defendant would be sentenced as a Range I offender, but had the State filed the appropriate paperwork, the defendant would have been sentenced as a Range II offender. Putting great weight on the defendant's previous criminal history, including the fact he should have been sentenced as a Range II offender, the trial court sentenced the defendant to twenty-five years on each count of attempted murder and six years on each count of

employing a firearm during attempted first degree murder. Based on the facts of this case, the trial court found the defendant "to be a dangerous offender whose behavior indicate[d] little, or no regard for human life," and ordered the sentences run concurrently for an effective sentence of life in prison plus one hundred and eighty-six years.

The defendant filed a timely motion for new trial, asserting: the court erred in not acquitting the defendant at the close of the State's proof; the trial court erred in not acquitting the defendant at the close of all proof; the State presented insufficient evidence to support the verdict; the evidence preponderates against guilt, so a new trial should be granted; and the trial court imposed an excessive sentence. The trial court denied the motion. The defendant's counsel subsequently withdrew, and the defendant retained a new lawyer after the deadline for an appeal had passed. This lawyer filed a motion requesting permission to file a delayed appeal as of right, and this Court granted the request.

*Analysis*

On appeal, the defendant challenges the sufficiency of the evidence, asserts the trial court improperly allowed testimony regarding the defendant's alleged gang affiliation, and imposed an excessive sentence. In response, the State points to the ample evidence of the defendant's guilt, contends the defendant waived his argument regarding gang affiliation evidence, and the trial court properly imposed consecutive within-range sentences. We agree with the State.

## I.      Sufficiency of the Evidence

The defendant first challenges the sufficiency of the evidence to support his convictions, arguing the State presented insufficient eye-witness testimony regarding his presence and actions, and the State failed to prove premeditation. The State counters that, taken in the light most favorable to the State, the evidence at trial proved beyond a reasonable doubt the defendant committed the offenses. The State further contends that given the proof regarding the defendant's actions, including the fact he shot at and chased unarmed victims, the jury had sufficient evidence to conclude the defendant premeditated both the first degree murder and the six attempted first degree murders. Following our review of the record, submission of the parties, and applicable law, we agree with the State.

When a defendant challenges the sufficiency of the evidence on appeal, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Evans*, 838 S.W.2d

185, 190-91 (Tenn. 1992) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Papas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witness face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). The extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Id*. This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id*.

At trial, the State was required to prove beyond a reasonable doubt that the defendant intentionally and with premeditated killed Mr. Pigrum. Tenn. Code Ann. § 39–13–202(a)(1). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39–11–302(a). Premeditation is defined as "an act done after the exercise of reflection and judgment" and committed after the accused "was sufficiently free from excitement and passion as to be capable of premeditation." Tenn. Code Ann. § 39–13–202(d). The existence of premeditation is a question of fact for the jury to determine based on a consideration of all of the evidence. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be inferred from the circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Addison*, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997).

With respect to victims Mr. Brown, Mr. Odom, Mr. Tate, Mr. White, Cedric, and Demetrius, the State was required to prove the defendant acted with the intent to kill these victims with the belief his conduct, without any further action, would cause their deaths. Tenn. Code Ann. § 39-12-101(a)(2). A person acts intentionally "when it is the person's conscious objective or desire to . . . cause the result." *Id*. § 39-11-302(a). "Intent, which can seldom be proven by direct evidence, may be deducted or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000).

The State was further tasked with proving beyond a reasonable doubt the defendant employed a firearm during the attempted first degree murders of victims Mr. Brown, Mr. Odom, Mr. White, Mr. Tate, Cedrick, and Demetrius. Employment of a firearm during the commission of a dangerous felony is a crime. Tenn. Code Ann. § 39-17-1324(b)(1),(2). Attempted first degree murder is defined as a dangerous felony. *Id*. § 39-17-1324(i)(1)(A).

A.      Identification of Defendant

When contesting the sufficiency of the proof to support his convictions, the defendant first asserts the eye-witness identifications made were weak, inconsistent, and on at least two occasions made by individuals with ulterior motives to identify the defendant as the individual who fired the gunshots. The State contends the defendant challenges the credibility of the witnesses, and credibility determinations are to be made by the jury, not this Court. We agree with the State.

- 8 -

At trial, the State presented proof the defendant always carried a .357-caliber handgun, and he had it with him the night of August 2, 2013. Around 10:00 p.m., the victims saw the defendant, who wore his hair in dreadlocks, standing by a dark car close to Beauchamp Street and Bishops Bridge Drive, holding a gun. Two men, including a man with dreadlocks, chased the victims down Beauchamp Street. As the victims ran, gunshots were fired at them. Mr. Tate and Demetrius, both victims, and Jackson, an accomplice, all identified the defendant as the individual who fired the gun. Officers collected four fresh bullet casings from the area the following morning. A firearms expert identified three of the casings as .357 Winchester bullet casings.

The State also presented evidence the defendant was a passenger in the Plymouth Breeze that followed Mr. Pigrum, Mr. White, and Cedric into Bertram Cove. Mr. Gainer identified the vehicle as the one he saw the night of August 2, 2013, in Bertram Cove. According to Mr. Gainer, there was a man hanging out of the vehicle and that the man fired shots in Mr. Gainer's driveway while Mr. Gainer stood in front of his house. Those shots ultimately killed Mr. Pigrum and damaged Mr. Gainer's car. Cedric, who was hiding in a nearby yard, saw the vehicle pull into the cove and witnessed the gunshots being fired. Cedric subsequently identified the defendant as the man who fired the shots and killed Mr. Pigrum.

While there was some inconsistency in the identifications of the individuals firing guns on Bishops Bridge Drive and Beauchamp Drive, the State presented overwhelming evidence of the defendant's guilt. The defendant now challenges the credibility of the witnesses, but the assessment of witness credibility is within the province of the jury. The State presented sufficient evidence to sustain the defendant's convictions for one count of first degree murder, six counts of attempted first degree murder, and six counts of employing a firearm during attempted first degree murder. The defendant is not entitled to relief on this issue.

B.    Premeditation

The defendant next challenges the sufficiency of the evidence to establish premeditation. A premediated act is one done after the exercise of reflection and judgment, and the intent to kill must have been formed prior to the act. Tenn. Code Ann. § 39-13-202(d). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id*. To be capable of premeditation, however, the accused must have been sufficiently free from excitement and passion. *Id*.

The Tennessee Supreme Court has further explained premeditation as follows:

The elements of premeditation and deliberation are questions for the jury which may be established by proof of the circumstances surrounding the killing. There are several factors which tend to support the existence of these elements which include: the use of a deadly weapon upon an unarmed victim; the particularly cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing.

*State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997) (internal citations omitted). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin,* 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Here, the evidence at trial revealed that Mr. Jones, a member of the Crips street gang, got into a fight with Mr. Singleton, a member of the Piru street gang. Shortly after Mr. Singleton reported the fight to his fellow gang members, the defendant, Mr. Jackson, Mr. Buckner, and Mr. Smith left Mr. Smith's house to find Mr. Jones. The defendant, Mr. Jackson, and Mr. Smith held superior gang rankings to Mr. Singleton, who stayed behind while the men pursued the fight. The defendant and at least one other accomplice were armed. All seven victims were unarmed, and the defendant fired at least eleven gunshots at them. The parties did not present any evidence of provocation by the victims. To the contrary, the victims were running from the defendant and his accomplices at the time of the attack. Mr. Pigrum died as the result of a gunshot wound to his neck, which was fired at him in relatively close proximity. Following the altercations, the defendant, a known gang member, rejoined his friends and discussed the events of the night, including the fact that he fired shots. Taken together, these circumstances establish premeditation. The defendant is not entitled to relief on this issue.

## II.     Rule 404(b) of the Tennessee Rules of Evidence

The defendant argues for the first time on appeal that the trial court violated Rule 404(b) of the Tennessee Rules of Evidence when it allowed testimony at trial regarding the defendant's gang affiliation. The State asserts the defendant has waived this argument by agreeing to the admission of testimony regarding the defendant's gang affiliation, failing to object at trial, and failing to raise this argument in his motion for a new trial. We agree with the State.

Prior to the start of the trial, the parties announced the following agreement regarding the introduction of evidence regarding gang affiliation:

> [The State]: The first matter, there hasn't been a motion in limine filed as to this. We have been in conversations with defense counsel. We wanted to put on the record that there's really no way to try this case without getting into gang affiliation. I think, also, part of their defense is going to center around gang affiliation, so we just wanted to put on the record, obviously, for any down-the-road 404(b) issues that the gang affiliation of witnesses including the defendants will be part of this trial, and I believe the defense has the same position.
>
> [Defense Counsel]: That's right, Your Honor. We're in the exact same position.

Both parties then mentioned the defendant's gang affiliation during their opening statements and proceeded to question the witnesses regarding gang affiliation. The defendant never objected. *See* Tenn. R. Evid. 103. Following trial and the entry of the guilty judgments, the defendant filed a timely motion for a new trial, where he again failed to raise his argument regarding the introduction of evidence regarding gang affiliation. Issues raised for the first time on appeal are waived. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding a defendant relinquishes the right to argue on appeal any issues that should have been raised in a motion for new trial but were not). Here, the defendant undisputedly raised his Rule 404(b) argument for the first time on appeal, so it has been waived. The defendant cannot prevail on this issue.

## III. Sentencing

### A. Length of Sentences

The defendant next argues the trial court abused its discretion when imposing the maximum sentences available for each count of attempted first degree murder. In response, the State contends the trial court properly imposed within-range sentences after considering the purposes and principles of sentencing, including multiple enhancement factors. Following our review of the record and applicable law, we agree with the State.

When an accused challenges the length, manner, or range of a sentence, this Court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

When imposing a sentence, the trial court must also consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the defendant in his own behalf. Tenn. Code Ann. § 40-35-210(b). In addition, the principles of sentencing provide the sentence should be no greater that that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(2), (4). To provide meaningful appellate review, the trial court must state on the record its reasons for the chosen sentence. Tenn. Code Ann. § 40-35-210(e).

"[A] trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Carter*, 254 S.W.3d at 343 (quoting Tenn. Code Ann. § 40–35–210(d)). The trial court shall consider, but is not bound by, the provision that "[t]he minimum sentence within the range of punishment is the sentence that should be imposed . . . [and] should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors." Tenn. Code Ann. § 40-35-210(c); *Carter*, 254 S.W.3d at 346. Non-exclusive lists of mitigating and enhancement factors are provided in Tennessee Code Annotated sections 40-35-113 and -114. Those enhancement factors, if not already an essential element of the offense, include in relevant part: a history of criminal convictions or criminal convictions in excess of that necessary to establish range; the defendant was a leader in the commission of an offense involving two or more criminal actors; and the defendant had no hesitation about the commission of the crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114. The weighing of both mitigating and enhancement factors is left to the sound discretion of the trial court, and a

misapplication of a mitigating or enhancement factor will not remove the presumption of reasonableness from the trial court's sentencing determination. *Bise*, 380 S.W.3d at 709.

Here, the trial court sentenced the defendant to twenty-five years in prison for each attempted first degree murder conviction. Despite an extensive criminal history that included two Class C felonies and multiple misdemeanors, the State did not file a notice to seek enhanced offender classification, so the trial court sentenced the defendant as a Range I, standard offender. Attempted first degree murder is a Class A felony, which has a statutory sentencing range of fifteen to twenty-five years. Tenn. Code Ann. §§ 39-11-117; 40-35-112. After placing great weight on the defendant's criminal history and finding the defendant to be a leader in the commission of the crimes, and he committed the crimes without hesitation despite the high risk to human life, the trial court imposed the maximum sentences available for the attempted first degree murder convictions.

Affording a presumption of reasonableness to the within-range sentence imposed by the trial court, we conclude the trial court did not abuse its discretion when sentencing the defendant to twenty-five years of incarceration for each attempted first degree murder conviction. While the trial court relied heavily on the defendant's criminal history and noted the defendant could have been sentenced as a Range II offender, for which the applicable sentencing range begins with twenty-five years, we are not persuaded by the defendant's argument that the consideration of this constituted error. The non-exhaustive list of enhancement factors set forth within Tennessee Code Annotated section 40-35-114 includes prior criminal convictions in excess of those necessary to establish range. In addition, the trial court found the facts established at trial indicated the defendant was the leader in the commission of the offenses and that he acted without hesitation when the risk to human life was high. As an example, the trial court pointed to Mr. Gainer's testimony that he was standing in his driveway at the time the defendant opened fire in Bertram Cove, forcing him to flee inside and causing damage to his car. Mr. Gainer was not an intended victim of any of the offenses at issue, and the risk to his life taken by the defendant was not an essential element to any charged offense. The defendant is not entitled to relief on this issue.

B.  Imposition of Consecutive Sentences

Finally, the defendant contends that the trial court erred when imposing consecutive sentences, arguing the minimum sentence of life plus thirty-six years was sufficient to achieve the deterrent, rehabilitative, and retributive purposes of the statute. The State contends that the trial court did not abuse its discretion. We agree with the State.

- 13 -

The imposition of consecutive sentences is within the broad discretion of the trial court, and when the trial court places findings on the record to support its sentencing decision, we review the trial court's decision to impose consecutive sentences under an abuse of discretion with presumption of reasonableness standard. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion set forth within Tennessee Code Annotated section 40-35-115(b)(1)-(7) has been satisfied. The enumerated criteria include "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). When the imposition of consecutive sentences is based on the trial court's finding the defendant is a dangerous offender, the court must also find "the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." *State v. Wilkerson*, 905 S.W.2d 938, 939 (Tenn. 1995).

After imposing sentences of life imprisonment for the first degree murder conviction, twenty-five years in prison for each attempted first degree murder conviction, and six years in prison for each employment of a firearm during the commission of a dangerous felony conviction, the trial court considered whether the sentences should run consecutive to one another. When doing so, the trial court considered the nature of the case and the large number of victims, ultimately finding the defendant to be a dangerous offender, explaining:

> He is a dangerous offender whose behavior indicates little or no regard for human life. His past has an aggravated assault, his past aggravated burglary, his past domestic violence, a man who beats up a woman is a violent person and he is a dangerous offender, a man who beats women is a dangerous offender, by definition.

> So anyway the factors there, as to a dangerous offender whose behavior indicates little, or no regard for human life. And I am basing this based upon the facts of this case. How he terrorized the neighborhood. Innocent boys walking down the street and he is going to be a big man with a gun. Well, he is going to be a big man for a long time, somewhere else, I suppose.

> No hesitation about committing a crime in which the risk to human life is high. And the aggregate length of the sentence as it reasonably related to the offense of which the defendant stands convicted. These are extraordinary circumstances, each one of these he ought to serve at one-

- 14 -

hundred percent (100%) and it defies logic why anyone would argue, or could say that these should be run concurrent.

He is a dangerous, dangerous man. Based upon the facts of this case and based upon his previous criminal history.

Based on the above findings, the trial court ordered the sentences to run consecutively for an effective sentence of life plus one hundred and eight-six years. When imposing consecutive sentences, the trial court provided adequate reasons on the record for doing so and made the findings required by *Wilkerson*. The trial court based its finding that the defendant was a dangerous offender on his criminal history and the facts of this case, which at trial revealed the defendant fired approximately eleven shots at unarmed victims, ultimately shooting one of them in the neck and jaw from close range, thereby causing his death. Discerning no error by the trial court, we affirm the imposition of consecutive sentences. The defendant is not entitled to relief on this issue.

### *Conclusion*

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE